No. 65.—EDWARD CAREY, assignee, &c. plaintiff in error, *vs.* HAMPTON S. SMITH, defendant in error.

[1.] An injunction bill which has been *sworn to,* cannot be amended, by *striking out* material and substantive matter and statements, allegations and charges; they are to be corrected by the addition of explanatory or supplemental statements; and this rule is as applicable to *all sworn bills,* as to those where injunctions are outstanding.

[2.] Amendments to a bill can only be granted, when the bill is defective in parties, or in the prayer for relief, or in the omission or mistake of a fact or circumstance connected with the substance, but not forming the substance itself, nor *repugnant* thereto; and a party under the privilege of *amending,* is not to introduce matter which will constitute a *new bill.*

[3.] An injunction bill will not be amended, unless the proposed amendments

are distinctly stated to the Court, and verified by the oath of the complainant, nor unless a sufficient excuse is rendered for not incorporating them in the original bill; and the application to amend must be made as soon as the necessity of the amendment is discovered.

[4.] An *amended* bill is considered as an *original* bill.

[5.] In Courts of Equity, the general rule is, that where parties are concerned in *illegal* agreements or other *illegal* transactions, whether they are *mala prohibita* or *mala in se*, the Court, following the rule of law as to participators in a common crime, will not interpose to grant any relief; acting upon the well known maxim, *In pari delicto, potior est, conditio defendentis et possidentis.* In all such cases, the rule is for the Court to leave the parties where it finds them, giving no relief and no countenance to claims of that character.

In Equity, in Muscogee Superior Court.　Decision on demurrer, by Judge IVERSON.

Edward Carey, as assignee of the Bank of Columbus, brought an action at law against Hampton S. Smith, as a stockholder of the Planters' and Mechanics' Bank of Columbus, to recover from him the amount of his ultimate liability for the redemption of the bills of the Planters' and Mechanics' Bank, held by the Bank of Columbus. The declaration averred that most of the bills were issued in March and October, 1838.

Smith filed his bill in Equity enjoining the above suit, and averring substantially, that long before the institution of the suit, the charters of both the Planters' and Mechanics' Bank and the Bank of Columbus, were forfeited by the judgment of the Superior Court of Muscogee County; that Carey " has not been constituted and appointed in any legal way or by any legal authority, assignee of the Bank of Columbus, being made by a Board of Directors not legally qualified and appointed ; that the bills sued on were issued and put in circulation when the said bank was in a state of failure and suspension, and so known to be, by the Bank of Columbus;" that these bills were not received by said Bank of Columbus until 1842, when both banks were in a state of suspension, and unauthorized, under their charters, to transact business. Proceedings at the time were pending to forfeit their charters; that when the Bank of

Carey *vs.* Smith.

Columbus received these bills, they knew that complainant was no longer a stockholder, having transferred his stock long prior to that time ; that said bank positively refused to receive said bills upon the responsibility of the bank or its stockholders, but received them upon the condition that one John Banks and other directors and stockholders of the said Planters' and Mechanics' Bank would execute their bond, personally binding themselves to redeem said bills, if the Bank of Columbus would receive them ; such bond was executed and the bills received upon the responsibility of this bond ; that this contract was " fraudulent and improper" on the part of the banks, and ought not to be enforced against its stockholders. The bill then charged as follows :

** " Your orator states with regard to the stock held in his name, as appears upon the books of said bank, he owned and held in his own right and for his own account only 1425 shares thereof; and as to the balance which appears by said stock account, to have been transferred to him, it was not so, transferred with a view to any ownership thereof by him ; that he at no time made any payment therefor, either in money, by note or otherwise, or any promise or contract for payment therefor, except a premium of one dollar per share, to S. A. Bailey, which he paid by the direction of Daniel McDougald. He states that said Planters' and Mechanics' Bank was organized, as he believes, under its charter, in the spring of the year 1837 ; that the stockholders who then took the stock, subsequently declined to prosecute the business of banking, without having issued any bill or incurred any liabilities within the knowledge of your orator, and some of them transferred their stock to your orator ; that subsequently, and in the year 1838, it was concluded to prosecute said enterprise, and this defendant was induced, for the benefit and at the instance of others, to collect together other purchasers of said stock, and in doing so, procured it to be transferred to him, without his assuming any liability therefor, either to the bank or any other person, except the payment to Bailey before stated. This stock, to the number of 3564 shares, thus transferred to your orator, as will be seen by reference to said stock account, was held in his

name, the greater portion thereof only a few days, some of it a few hours, and transferred to those persons for whom it was procured, viz:—200 shares to S. A. Bailey, 600 shares to D. McDougald, 600 to M. W. Perry, 200 to John Banks, 1689 other shares to D. McDougald, and 273 other shares to M. W. Perry; and your orator states that he at no time voted upon or claimed said 3564 shares in his own right; that he was not recognized or considered as the owner thereof by the bank or any of its stockholders, and that the same was transferred to the several persons before stated, before said bank issued a bill or incurred a liability of any sort.

"It is proper that your orator in this connection, should state that the 900 shares transferred by him on 27th March, 1838, in equal numbers (300 to each) to John E. Morgan, Wm. A. Redd, and Wm. Redd, senior, were his, and that whatever liabilities may have attended to the ownership thereof, are his, as the same are transferred to and held in the names of the said Morgan and Redd, for your orator's benefit, and without the intention on the part of the said transferrees in any manner to hold or claim the same for their own account; and that the said stock so held by said Morgan and Redd, was transferred by them or by your orator at their request, as will appear upon the stock ledger and transfer-book, on the 28th October, 1839—which transfer was made upon the contract and for the exclusive benefit of your orator, and as he believes, without their knowledge. (Here was inserted complainant's stock account, amounting to 4989 shares.) All of which was transferred prior to the contract with the Bank of Columbus, before set forth. That when the Planters' and Mechanics' Bank commenced business in February, 1838, it did so as a suspended bank; that during all the time the complainant was a stockholder, though the bank did not pay specie, it was at all times fully and abundantly able to meet all its liabilities, and did meet them in every instance when called upon, to the satisfaction of all persons having any claims upon it of any character whatever." **

The bill further charged, that for more than two years after the transfer of all complainant's stock, the bank continued busi-

Carey *vs.* Smith.

ness, " someties paying specie and sometimes not," and was during all the time solvent; that the persons to whom he transferred his stock, were at the time " for the most part solvent ;" that long after he ceased to be a stockholder the Legislature passed an Act relieving the bank from the effect of the suspension, if it would resume and continue specie payment ; and that in pursuance thereof, the bank did resume specie payment, but how long it continued so to do, complainant was unable to say ; that sometime during the year 1841, in March or April of that year, said bank, as well as the bank of Columbus, failed to redeem their bills *in specie*, and their respective charters were *forfeited;* that complainant did not give notice as required by the charter, immediately on transferring his stock, but did so long before the final failure of the bank, and before the arrangement between it and the Bank of Columbus, hereinbefore set forth ; that if liable at all, it is only for the *ultimate* redemption of the bills, and that the assets of the bank in the hands of the assignee had not been exhausted, especially the balance of the capital stock unpaid, amounting to $750,000 ; that the assignee of the Bank of Columbus had compromised with John Banks and others for their liability for the sum of $6000 ; (the bill sought for discovery as to this arrangement); that the banking house was liable to pay the debts of the bank, and that Carey as assignee, should not go upon complainant until he had exhausted his remedy upon the bond, and the equitable assets in the hands of the receiver.    The bill prayed an injunction, and was sworn to by H. S. Smith, the complainant.

To this bill, Carey, assignee, demurred on various grounds, and among others, for want of Equity, submitting to answer such portion of the bill as sought for discovery.

Subsequently complainant served the defendant with notice of an amendment by which he sought to strike out all that portion of the original bill copied above and included within the asterisks, (**) and to insert in lieu thereof an amended bill, in which, among other things, it was charged, that shortly after the organization of the corporation, it was resolved, " that in consequence of the derangement of the monetary system throughout the Uni-

ed States, it would be imprudent for the bank to make any issue of bills, and therefore that the bank would not commence operations, but for the present put out at interest the capital paid in ; that subsequently, it being deemed advisable to call in the capital and commence business, certain stockholders, amounting to 3635 shares, being unwilling to continue their investment, transferred their stock to complainant, merely to be transferred to others as they might desire it, which was accordingly done, before a single bill was issued. The amended bill set out more specifically the arrangement between the Bank of Columbus and the Directors of the Planters' and Mechanics' Bank— the giving of the bond by John Banks and others, and charged that this arrangement was made for the benefit of the directors giving the bond, and the bills were received upon their credit and responsibility ; that Carey, as assignee, has since released the obligors in the bond from all liability thereon, and is now seeking to make the stockholders responsible for the bills received upon the faith of this bond, by the Bank of Columbus.

Carey filed a demurrer to the bill as amended, to the mode of amending said bill, and as to the relief prayed for, offering to answer the remainder of the bill.

The hearing of the demurrers, and the motion to amend came on to be heard together, when complainants moved still further to amend, by striking out the allegation in the original bill as to the resumption of specie payment by the bank, and also the words, " sometimes paying specie and sometimes not."

Upon argument had, the Court below allowed all the amendments proposed, and overruled the demurrer on all the grounds taken.

This decision is assigned as error.

Law and W. Dougherty, for plaintiff in error.

B. Hill and Colquitt, for defendant in error.

*By the Court.*—Warner, J. delivering the opinion.

Carey *vs.* Smith.

This bill is filed by the complainant, for the purpose of enjoining a suit instituted against him by Edward Carey, assignee of the Bank of Columbus, on the Common Law side of the Court, as one of the stockholders of the Planters' and Mechanics' Bank of Columbus, for the ultimate redemption of the bills issued by that bank, according to the provisions of the 11th section of the charter thereof.

The complainant alleges in his bill, that there are various equitable circumstances which ought to exonerate him from the payment of the bills sued on, as a stockholder, and especially, that there was a *fraudulent* combination between a portion of the directors of the Planters' and Mechanics' Bank and the Bank of Columbus, for the benefit of said directors; and that the bills in question were not received by the Bank of Columbus (the assignee of which is now seeking to enforce the payment thereof) on the credit of the Planters' and Mechanics' Bank, but on the credit of a personal guarantee made by a portion of the directors of the Planters' and Mechanics' Bank, for their own personal benefit and private speculation; all of which was well known to the Bank of Columbus, when the bills now sued on were received by the last mentioned bank. The prayer of the bill is, that the assignee of the Bank of Columbus may be perpetually enjoined from prosecuting his said suit on the bills of the Planters' and Mechanics' Bank against the complainant, as a stockholder in the last named bank, and for other relief, &c. To so much of the complainant's bill as sought a discovery from the defendant in relation to the banking house and lot of the Planters' and Mechanics' Bank, and the alleged contract or agreement in regard to the same, the defendant answered. To the other portions of the bill, the defendant demurred. After the demurrer was filed by the defendant, the complainant obtained leave of the Court to amend his bill, by *striking out material parts thereof*, and to make new and distinct allegations in relation to the same subject matter; which was allowed by the Court.

[1.] The defendant objected to the amendment of the complainant's bill, by *striking out* material allegations, admissions,

and averments contained therein ; insisting that he was entitled to demur to the bill as it originally stood, with the additional matter introduced by way of *amendment.*

The first question to be considered and decided, is, whether a complainant in an injunction bill, which has been sworn to by him, can amend it by *striking out* material averments and allegations contained therein ? Such a practice cannot, in our judgment, be sustained, either upon principle or by authority. In *Verplanck vs. The Mercantile Insurance Company*, (1 *Edwards' Ch. Rep.* 46,) this identical question appears to have been well considered, on an application to amend an injunction bill.

[2.] In that case it was held, that material and substantive matter, and statements, allegations and charges, which have been *sworn to*, cannot be *stricken out;* they are to be corrected by the addition of explanatory or supplemental statements ; and this regulation was held to be as applicable to ordinary sworn bills, as to those where injunctions are outstanding. It was also held in that case, that amendments to a bill can only be granted when the bill is defective in parties, or in prayer for relief, or in the omission or mistake of a fact or circumstance connected with the substance, but not forming the substance itself, nor *repugnant* thereto ; and that a party under the privilege of *amending*, is not to introduce matter which would constitute a *new bill.*

[3.] In *Rodgers vs. Rodgers*, (1 *Page's Ch. R.* 424,) it was held that an injunction bill will not be amended, unless the proposed amendments are distinctly stated to the Court, and verified by the oath of the complainant, nor unless a sufficient excuse is rendered for not incorporating them in the original bill, and that the application to amend must be made as soon as the necessity of the amendment is discovered. One cogent reason for not allowing a party complainant in a *sworn* injunction bill to *strike out* material allegations and averments therein, by way of amendment, is, that if he should swear *falsely* for the purpose of obtaining the injunction, he might by that means, destroy and obliterate all trace of the *evidence* of his offence. The Court below erred, in our judgment, in allowing the complainant to

Carey *vs.* Smith.

*strike out* of his bill the averments and allegations marked and designated in the record before us.

The defendant was entitled to demur to the complainant's bill as it stood, before the order to *strike out* was made; that is to say, he was entitled to demur to the complainant's bill, as amended by the insertion of the new matter, without any portion thereof being *stricken out.* The bill as it was originally *sworn to* by the complainant and filed in office, together with the additional matter introduced by way of amendment, constituted *the complainant's bill,* at the time the demurrer was heard and determined in the Court below.

[4.] An *amended* bill is considered as an original bill.  2 *Maddock's Ch. Prac.* 369.  At the May Term, 1852, the defendant filed additional grounds of demurrer to the complainant's bill, as *amended,* the second ground of which is in the following words— " And for further cause of demurrer to said bill as amended, this defendant sheweth that the complainant shews by his said amended bill, he has been guilty of a violation of the charter of the Planters' and Mechanics' Bank, and of committing a gross fraud in the organization of the same, and therefore is not entitled to come into a Court of Equity, and ask relief from the consequences thereof."

[5.] It is undoubtedly a principle of Equity jurisprudence, that he who seeks equity, must come into Court with clean hands. The general rule is, that where parties are concerned in illegal agreements or other illegal transactions, whether they are *mala prohibita,* or *mala in se,* Courts of Equity, following the rule of Law, as to participators in a common crime, will not interpose to grant any relief; acting upon the well known maxim, *In pari delicto potior est conditio defendentis et possidentis.*  In all such cases the rule is, to leave the parties where it finds them, giving no relief and no countenance to claims of that character.  1 *Story's Equity,* 295, sec. 298.  *Thompson vs. Thompson,* 7 *Vesey,* 470.  This doctrine has been fully recognized and adopted by this Court, in *Howell, adm. vs. Fountain et al.,* 3 *Kelly's Rep.* 176. The question raised by the defendant's second ground of demurrer to the complainant's bill as amended, necessarily leads us

to inquire whether the complainant by his own allegations in his bill, clearly shows that he *actively* participated in the organization of the Planters' and Mechanics' Bank, as one of the stockholders thereof; and whether he was such stockholder, at the time the bills in controversy were issued by the bank? Was the bank organized by the stockholders in accordance with the provisions of the charter? Were the bills of the bank, from the payment of which the complainant seeks to be protected, issued according to the provisions of the charter?

To answer these several inquiries satisfactorily, we must refer to the charter of the bank, and to the statements and allegations contained in the complainant's bill.

By the second section of the charter incorporating the Planters' and Mechanics' Bank of Columbus, it is declared, " that the stock of the company shall consist of one million of dollars, in shares of one hundred dollars each, and *the stockholders in said bank, are hereby required to pay twenty-five per cent. on the amount of their capital stock, in specie, before the Board of Directors shall be permitted to issue their bank notes.*"

The charter of the bank then, it will be perceived, *imperatively* required that the stockholders should pay in the sum of two hundred and fifty thousand dollars *in specie*, before the company should be permitted to issue their bank notes.

By the 4th section of the charter it is declared, that " for the well ordering of the affairs of said corporation, there shall be seven directors, who shall be elected as soon as the sum of two hundred and fifty thousand dollars *in specie*, shall have been paid in by *the stockholders* of the bank, and the President, Directors, and Cashier, are hereby *expressly inhibited from the issuing of their bank notes, until they have officially and under oath, notified the Governor that the provisions of this charter have been literally and strictly complied with.*" *Prince*, 125–6.

This section of the charter demonstrates, in *unequivocal terms*, the meaning and intention of the Legislature, in regard to the organization of this bank.

It was the intention of the Legislature to protect the community against the evil consequences of a *depreciated paper currency*,

by expressly inhibiting the company from issuing their bank notes, until the provisions of the charter had been *literally and strictly complied with.* This charter was accepted by the stockholders in *the terms* which the Legislature enacted it, and they consequently are *bound by its provisions.* The complainant was one of the original corporators and stockholders in the Planters' and Mechanics' Bank. Now let us turn our attention to the statements and allegations contained in the complainant's bill, and see in what manner this bank was organized, and under what circumstances most of the bills, now the subject matter of controversy, were issued by the bank.

The complainant in the amendment to his bill, avers, that on the 30th December, 1836, he with others, accepted the charter, and that he subscribed for stock to the number of twelve hundred and sixty-four shares, and paid upon the same thirty-one thousand six hundred dollars, or twenty-five per cent. ; that shortly after the organization of the bank, the complainant, with the other stockholders, held a meeting, when it was resolved, that in consequence of the derangement of the monetary system in the United States, it would be imprudent for the bank to make any issue of bills, and that the bank would not commence operations under the charter, but would for the present, *put out at interest, the capital paid in ;* that in the beginning of the year 1838, a portion of the stockholders deemed it *advisable to call in their capital stock,* and commence business, and that Terry, Pope, and others, who owned thirty-six hundred and thirty-five shares of stock, being unable or unwilling to continue their investment in stock, transferred the same to the complainant, so that he might transfer it to such persons as might apply therefor, and that said shares were transferred by him, to Bailey, Banks, and others, before the bank issued any bills; except seventy-one shares, which complainant retained for himself, making him the owner, on the 8th day of February, 1838, of thirteen hundred and thirty-five shares of stock; prior to which day the bank had made no issue. In Septembnr, 1838, the complainant purchased forty shares of stock, and in January, 1839, he purchased fifty shares, making

his aggregate number of shares of stock in the bank, on the 5th day of January, 1839, fourteen hundred and seventy-five shares. By reference to the declaration which is attached to the complainant's bill, and made a part thereof, it appears that most of the bills sued on, were issued by the bank in the year 1838, during the time the complainant was a stockholder, he having sold his stock as he alleges, in October, 1839.

The complainant then, was one of the *original* stockholders when the bank was organized; originally subscribed for twelve hundred and sixty-four shares of the stock; was the owner of thirteen hundred and thirty-five shares of stock on the 8th February, 1838, and on the 5th day of January, 1839, owned fourteen hundred and seventy-five shares of the stock of the Planters' and Mechanics' Bank of Columbus. In October, 1839, he sold, and transferred all his stock in the bank. From the 30th December, 1836, up' to the 28th day of October, 1839, the complainant was a large stockholder in this banking company.

We have seen, that by a resolution of the stockholders, the capital stock of the bank paid in, was *put out at interest* shortly after its organization; but whether it was put out at interest in the hands of the stockholders or other persons, *this* record does not inform us. The complainant alleges that in the beginning of the year 1838, a *portion* of the stockholders deemed it *advisable to call* in their capital stock, and commence business; but it is not alleged that any portion of the stockholders did *in fact*, call in, and *actually pay in*, the capital stock of the bank, which had been by resolution, *put out at interest.* Deeming it *advisable* to call in the capital stock of a bank, which had been put out at interest by the stockholders thereof, is one thing—the *actual calling it in*, and *paying it in*, is another and quite a different thing, at least, so far as the bill-holders are concerned.

One of the counsel for the complainant states, that the omission to allege that the capital stock put out at interest, was *actually paid in*, was a mistake of the pleader. We have only to say, that if such be the cause of the omission, it is a most *fortunate* circumstance for the complainant, if the record in the case of Lane vs. Thornton, which has been argued in connexion with this case, *be true.*

It appears from the testimony of Ragan, which is in the record of that case, that he was the Cashier of the bank in 1838, when it first commenced issuing bills; that the bank did not have but little specie on hand, or in its vault—not exceeding eight hundred or one thousand dollars; and that two hundred and eighty, or three hundred thousand dollars in bills, were issued by the bank in 1838. The facts, as disclosed by the record, in the case of *Lane vs. Thornton*, being *judicially* made known to us, and that case having been argued in connexion with this, has induced us to scrutinize the complainant's allegation in regard to *calling in the stock*, more closely than we otherwise should have done. With that record before us, we conclude that the omission of the complainant to state that the capital stock of the ·bank put out at interest was *actually paid in*, when the bank commenced issuing bills in 1838, was not a *mistake of the pleader*. The complainant shews by his bill, that the capital stock of the bank was *put out at interest* previous to the year 1838, but does not shew, that it was *returned to the bank* when most of the bills in controversy were issued during that year. The complainant has failed to shew *affirmatively*, that the provisions of the charter were complied with in that particular. When the bills were issued in 1838, he shews that the capital stock of the bank was *put out*, but has failed to shew that it was ever again *put into the bank*. We have thus far considered this question, as if the capital stock of the bank had been originally paid in by the stockholders, *in specie*, as required by the charter. Does the complainant shew that it was so paid in? So far from shewing that the capital stock of the bank was paid in by the stockholders *in specie*, the contrary is most clearly demonstrated. The complainant alleges in his amendment to his bill, that "*the books of subscription were opened in pursuance of the charter*, and that he subscribed for stock in the bank to the number of twelve hundred and sixty-four shares, and paid upon the same the sum of thirty-one thousand six hundred dollars, or twenty-five per cent." By the second section of the charter, as we have already shewn, the stockholders were required to pay twenty-five per

cent. on the amount of their capital stock *in specie*, before the company could issue their bank notes.

Although the complainant states that " the *books of subscription were opened* in pursuance of the charter," he does not allege that the thirty-one thousand six hundred dollars was paid by him *in specie ;* or that *it was paid in pursuance of the charter.* The books of subscription may have been opened *in pursuance of the charter*, but it does not necessarily follow, that the complainant paid the twenty-five per cent. on the amount of his capital stock *in specie, in pursuance of the charter.*

If the twenty-five per cent. on the amount of the complainant's capital stock was in fact paid by him *in specie* in pursuance of the charter, why did he not so allege it ? It was a most *material* averment for him to make, in order to invoke the aid of a Court of Equity to grant him the relief which he seeks.

Whether the thirty-one thousand six hundred dollars was paid in by the complainant in the bills of suspended banks, or in stock notes, *this* record does not inform us. In regard to the thirty-five hundred and sixty-four shares of the stock which was transferred to the complainant in the beginning of the year 1838, by Terry, Pope, and others, and by him re-transferred to Bailey, Banks, Perry and McDougald, there is no allegation *that any thing was ever paid into the bank on that stock*, either by the original subscribers, the complainant, or those to whom he transferred it, *at the time the company commenced issuing their bank notes, in* 1838; but the presumption is very strong, from what the complainant does allege, that *nothing was paid on that stock up to that time.*

The complainant states in the original portion of his bill, that that stock was not transferred with a view to any ownership thereof by him ; *that he at no time made any payment therefor*, either in money, by note, or otherwise, or any *promise or contract for payment therefor*, except a premium of one dollar per share to S. A. Bailey, which was paid by direction of D. McDougald ; that in the year 1838, it was concluded to *prosecute the enterprise*, and complainant was induced, for the benefit, and at the instance of others, to collect together other purchasers of said stock, and

Carey *vs.* Smith.

in so doing, procured it to be transferred to him, without his assuming *any liabilities therefor*, either to the bank or to any other person, except the payment to Bailey, as before stated.

Now, if Terry, Pope, and others, who were the original subscribers for the thirty-five hundred and sixty-four shares of stock, had paid in thereon, the twenty-five per cent. *in specie*, as required by the charter, it is not reasonable to conclude that they would have transferred their stock to the complainant without his *paying*, or at least *assuming a liability therefor ;* which he expressly states *he did not do.* Nor does the complainant allege, that those to whom he transferred the stock *paid him* any thing for it, or that they *paid into the bank* any thing for the stock, *at the time* the complainant as a stockholder, and his transferrees as stockholders, " *prosecuted the enterprise*" of issuing the bills of the bank, in 1838. But we are not left in doubt that the bank went into operation in 1838, and commenced issuing its bills in *open violation of its charter ;* the statements of the complainant furnish the most *conclusive evidence* upon that point. Most of the bills sued on, it will be recollected, were issued by the bank in 1838, and that no bills were issued until the beginning of that year. On the third page of his original bill, the complainant alleges, " that *long prior* to said bills being issued and put in circulation by the said Planters' and Mechanics' Bank, the same was in a state of *failure* and *suspension*, and so known to be to the said Bank of Columbus, &c." On page nine of the original bill, the complainant further states, "·that when the Planters' and Mechanics' Bank of Columbus went into operation, and commenced issues and discount, and the receipt of deposits, in February, 1838, it went into operation and commenced, and prosecuted its business as a *suspended* and *non-specie-paying* bank." The complainant, as it appears by his own shewing, was one of the original stockholders who *actively* contributed to put this banking company into operation—owned a large amount of the stock at the time most of the bills were issued, from the payment of which he now seeks relief as such stockholder. And so far from the stockholders in said banking company

paying twenty-five per cent. on the amount of their capital stock *in specie*, before issuing their bank notes, as specially required by the charter, the bank, in the language of the complainant, " *long prior* to the bills being issued and put in circulation, was in a state of *failure* and *suspension.*"

It is true, the complainant alleges in the amendment to his bill, that on the 28th day of October, 1839, when he *bona fide* sold out all his stock in said bank, it was *perfectly solvent,* having a *large surplus fund.* In what that large surplus fund consisted, we are not informed. It however required no prophetic vision to discover, that a bank organized as this was, without any *specie* basis for the redemption of its bills, could not long maintain its credit, when settlement day should arrive ; especially, as when its bills were first issued and put in circulation, " it was in a state of *failure* and *suspension.*" The consequences resulting from this illegal transaction, furnishes a melancholy portion of the history of our State, as those who *confidingly* exchanged their labor and produce for the bills of the bank, can bear ample testimony. It was urged on the argument, that the Act of 10th Dec. 1841, granted a *pardon* to all the banks in this State which had failed to redeem their liabilities in specie, which included the Planters' and Mechanics' Bank. Conceding that Act was intended to embrace such banks as went into operation in *open violation* of their charters; yet, the complainant very clearly shows, that this bank is not within its provisions, for the reason, it did not comply with the requisitions of the Act of 1841. That Act extended to such banks only, as should commence to redeem their liabilities on demand, *in specie,* by or before the 1st day of January, 1842, and shall *continue thereafter* to pay on demand, all their liabilities *in specie. Hotchkiss,* 363.

The complainant alleges in the amendment to his bill, " that in March or April of 1841, the Planters' and Mechanics' Bank, and the Bank of Columbus, each failed to redeem their bills *in specie;* in consequence thereof, proceedings were instituted against both of said banks, for the forfeiture of their charters, and upon said proceedings, *judgments of forfeiture were severally rendered,* as will appear by the proceedings hereunto annexed,

marked exhibit A and B." The Planters' and Mechanics' Bank did not accept the *terms of pardon* offered by the Legislature, by redeeming their liabilities on demand *in specie ;* consequently, judicial procedings were not arrested, and the charter was *forfeited* by the judgment of the Superior Court of Muscogee County. There is another fact apparent on the face of the complainant's bill, to which our attention was called on the argument. The stock account of the complainant, which he alleges was taken from the books of the bank, shows, that John E. Morgan, Wm. A. Redd, and Wm. Redd, sen. were the owners of three hundred shares each, of the capital stock of the Planters' and Mechanics' Bank.

The complainant, however, alleges, that although the stock appears on the books of the bank to have been owned by Morgan, Wm. A. Redd, and Wm. Redd, sen. yet he was in fact the owner thereof; although the same was transferred by him to them on the 27th March, 1838, it was done for the complainant's benefit. In view of the laws of the State, which required semi-annual returns to be made to the Governor of the names of all the stockholders, and the amount of stock owned by each, &c. for the information of the public, the names of solvent, responsible men, appearing as *stockholders* on the books of the bank, when in truth and in fact, they were *not such stockholders,* was eminently calculated to *mislead* and *deceive* the community in which the bills of the bank were circulated, to say the least of it. Persons knowing the Messrs. Redds and Morgan, who were represented to be the owners of *ninety thousand dollars* of the capital stock of the bank, may have taken the bills on *their* credit, when they would have been unwilling to have received them on the credit of the *unknown real owner.* When we take into view the *imperative* provisions of the charter of the Planters' and Mechanics' Bank, and the *principles* by which Courts of Equity are governed in granting relief to a party, against the consequences of his own *illegal* transactions; to state *the facts* of this case, as the same appear by the complainant's own showing, *is to decide it.* A Court of Equity will not interfere to as-

sist him, but leave him to defend himself at Law, as best he can. Let the judgment of the Court below, overruling the demurrer to the relief sought by the complainant, be reversed.